[No. 13318. Department One. April 4, 1916.]

JESSE E. SPEAR *et al.*, *Appellants*, v. THE CITY OF
BREMERTON, *Respondent*, KITSAP HOTEL INVESTMENT
COMPANY *et al.*, *Interveners.*[1]

WATERS AND WATER COURSES—PUBLIC SUPPLY—POWER OF CITY—
SURPLUS. A city has power to purchase a water system theretofore
established and to dispose of any excess or surplus in the supply to
any person within or without the city.

JUDGMENT—CONCLUSIVENESS—PARTIES CONCLUDED. A judgment in
an action by a city involving only the power of a city to purchase
a water supply system and the price to be paid, is not *res judicata*
or a bar to an action by taxpayers to enjoin the issuance of bonds
for the purchase; as the city was not bound to proceed if the price
was unsatisfactory, and until it did the taxpayers were not inter-
ested.

WATERS AND WATER COURSES—PUBLIC SUPPLY — ACQUISITION BY
CITY—SALE OF SURPLUS—STATUTES. A city has power to acquire a
water system and, after supplying its inhabitants, to dispose of sur-
plus water to another municipality, under Rem. & Bal. Code, § 8005,
authorizing such acquisition for the purpose of supplying its inhabi-
tants "and any other persons," and 3 Id., § 8010-6, giving any city
owning and operating its plant the right "to dispose of any surplus
. . . remaining after the wants of the inhabitants thereof have
been supplied."

SAME. The power of a city to dispose of its surplus water after
supplying the wants of its inhabitants does not include the power
to purchase and maintain a distributing system in another city or
acquire the franchise of a water company therefor; since that is
not directly or by implication authorized by statute, and the city
cannot exercise the functions of such other city or deprive the latter
thereof.

MUNICIPAL CORPORATIONS—PUBLIC WORKS—SALE OF BONDS—INTER-
EST—DISCOUNT. A bond issue to pay for a water works system can-
not be sold at a discount of five per cent, ostensibly to cover all
commissions, attorney's fees and expenses, but which was in fact a
bonus for the benefit of the buyer increasing the rate of interest
which the bonds were to bear.

[1]Reported in 156 Pac. 825.

Waters and Water Courses—Public Supply—Acquisition by City—Excess Supply. Where a city purchases an existing water plant, taxpayers cannot complain that the city's present use is only forty per cent of the supply.

Appeal from a judgment of the superior court for Kitsap county, Dykeman, J., entered November 24, 1915, dismissing an action for equitable relief, after a trial to the court. Modified.

*A. C. Durham* and *Robinson & Robinson*, for appellants.

*Marion Garland* and *Bryan & Colvin* (*J. W. Bryan*, of counsel), for respondent and interveners.

Chadwick, J.—This is an action by citizens and taxpayers of the city of Bremerton to restrain the issuance of bonds for the purchase of the Bremerton Water Company's plant. The right of the city to purchase, under certain reservations in the franchise, was established in the case of *Bremerton v. Bremerton Water & Power Co.*, 88 Wash. 362, 153 Pac. 372.

This action is maintained upon the theory that the city is proceeding without power and for that reason the issue should be restrained. A brief resume of the facts is necessary to a complete understanding of the issues and the conclusions we have drawn therefrom. On March 14, 1902, the predecessors of the Garrison-Fisher Company obtained a franchise to construct and maintain a waterworks system in the city of Charleston. On the 7th day of April, 1902, a like franchise was obtained from the city of Bremerton. Since that time, the Garrison-Fisher Company has maintained a water system which supplies the cities of Charleston and Bremerton, the Navy Yard, and outlying territory in the vicinity of the two towns; the proportion of use being, approximately, Bremerton, forty per cent; Charleston, twenty per cent; and the Navy Yard and outlying suburbs, forty per cent.

The supply of water comes from head works which are west of Charleston. The main pipe line runs east through

Charleston, and into the city of Bremerton. The Navy Yard takes its supply at the yard limits. The government owns and maintains its own distributing system. The city of Bremerton proposes to take over the whole plant, and in turn supply the two municipalities and the other customers of the present company as a business enterprise. The trial judge sustained the city in all its contentions.

We shall notice the several assignments of error in their order:

(1) We hold that the city has a right to purchase a water system theretofore established (Rem. & Bal. Code, § 8005; P. C. 77 § 1073), subject to such qualifications as are hereinafter noticed, "and to dispose of any excess or surplus of any such supply to any person within or without the city." Having this power, it is unnecessary to discuss the question of *res judicata* which is based upon the case of *Bremerton v. Bremerton Water & Power Co., supra.* The power to purchase generally, and the price to be paid, were the only questions involved in the former case. The exercise of the power was not involved and not passed upon. Neither were these appellants bound to intervene or otherwise assert their rights as taxpayers in that case under the authority of *Stallcup v. Tacoma,* 13 Wash. 141, 42 Pac. 541, 52 Am. St. 25. They were not bound to speak until it became evident that the city had fixed the purchase price and was proceeding to put a charge upon their property to pay it. In other words, the city was not bound to proceed if the price was not satisfactory. Until it did, the taxpayer had no interest.

(2) It is next contended that the city cannot own a system for the purpose of distributing water outside of its corporate limits, or to another municipality. The case of *Farwell v. Seattle,* 43 Wash. 141, 86 Pac. 217, is relied on to sustain the doctrine that the powers of a municipality cannot be extended beyond the terms or necessary implications of the statute. The power of a city to purchase a water works is given by § 8005 of Rem. & Bal. Code. It reads:

"Any incorporated city or town within the state be, and is hereby, authorized to construct, condemn and purchase, purchase, acquire, add to, maintain, conduct and operate waterworks, within or without its limits, for the purpose of furnishing such city or town and the inhabitants thereof, *and any other persons*, with an ample supply of water for all uses and purposes, public and private, including water power and other power derived therefrom, with full power to regulate and control the use, distribution and price thereof."

It is insisted that the power to supply is limited to the actual inhabitants of the city *"and any other persons;"* that, under the rule of *ejusdem generis*, as declared in *Farwell v. Seattle, supra,* the word "persons" means persons within and not without the city. The *Farwell* case was decided under the act of 1890, Ballinger's Code, § 739. Since then, we have the act of 1909, Rem. & Bal. Code, § 8005 (P. C. 77 § 1073), the act of 1911, ch. 111, Laws of 1911, p. 512, § 6 (3 Rem. & Bal. Code, § 8010-6), and the act of 1915, ch. 184, p. 659, § 16.

It seems to have been the purpose of the legislature to make it plain that the surplus of a municipally owned plant could be sold to those outside of a city by the act of 1911, but for some reason, this act was repealed (Laws 1915, ch. 112, p. 318), and the act of 1915, just referred to, was thereafter passed. Section 16 of the later act gives the right in terms, "to dispose of any excess of any such supply to any person within or without such city." The power to sell without such city implies that a sale may be made to those other than the inhabitants thereof. The power to sell implies the power to distribute, and we have no hesitation in holding that the city may sell its surplus to the Navy Yard, and to those living within the unincorporated territory in the vicinity of the corporate limits.

The act of 1915 is attacked upon grounds which, in view of our construction of the other acts, are not necessary to be discussed.

The next question, whether the city of Bremerton can purchase and maintain a distributing system in the city of Charleston, or acquire the franchise heretofore owned by the Bremerton Water Company (Garrison-Fisher Company), is of more consequence. We are of the opinion that it cannot. The power is not within the terms of the several acts to which reference has been had, and it is certainly not within the necessary implications of any of them. The purpose of the law is plain. It is to give a city the power to acquire, by purchase or otherwise, a water system for the benefit of its own inhabitants, and the power, pending a use by its inhabitants, to dispose of any surplus. The power to sell the excess is incidental to the main purpose; that is to say, a city can develop a plant or purchase an existing plant, and whichever its method may be, it can reasonably anticipate the future and develop or purchase more than enough to supply its present needs. The statute does not authorize, even by the remotest implication, one city to take over a distributing system in another city. To supply water to the inhabitants of a city, is a municipal function. It is to be controlled by the city *using* it, and not by the city *selling* it; and notwithstanding it is said that the city of Charleston, through its council, has indorsed this proceeding and waives its reserved rights under the franchise in favor of Bremerton, and notwithstanding the power of Bremerton to sell its *surplus* to the city of Charleston, it cannot invade or take away the power and the duty of the council of Charleston to deal with its own inhabitants directly, and not through the instrumentality of another, in the exercise of every function committed to it by the legislature.

There is another reason why it cannot be so. The city of Bremerton, in its corporate capacity, cannot place itself in an attitude or position where it is bound, in any degree, by contract, express or implied, to exercise a municipal function in another city which might impair its primary duty to

its own inhabitants. Its power is limited to the sale of a surplus or excess. If the time should come when there is no excess or surplus, the inhabitants of the city owning the plant would be entitled to the use of all the water, and those who take the surplus would be cut off. In other words, the purchaser of the surplus or excess would purchase with the statute before him, and would be entitled to receive only the surplus, not a proportionate share. Nor could he compel the selling city to add to the plant or the supply for his benefit; the reason being, as we suggested in the case of *Uhler v. Olympia*, 87 Wash. 1, 151 Pac. 117, 152 Pac. 998, that the statute does not bear the construction that the legislature intended that a city should go into the business of supplying water for profit or as a commercial enterprise, but only for the benefit of its inhabitants who are to be put to no burden other than the payment for and upkeep of the plant, including interest, with such reasonable additions to the system as attention to thrift may dictate.

Another reason—or, rather, an argument in favor of the one reason—is that the streets and alleys of the city of Charleston belong to it. It is charged with the duty of improving them and keeping them in repair. It, and it alone, can regulate and control their use; and to permit another city to maintain, repair, and extend mains throughout the city would rob it of one of its most important functions. Then, too, a sound public policy demands that a city have within its own control its fire hydrants and other means of distributing and controlling the distribution of water in case of fire. It would seem that these were reasons enough. Cases to sustain our holding are not necessary, but one case which is worthy of attention has been cited. The town of Clifton, having power to provide a water system, either by the municipality or by another under contract with it, advertised for bids for a twenty-year franchise. Among several, the city of Newport, having an excess of water over its needs,

was the successful bidder. It was held that a city could not
acquire property for any purpose or engage in any kind of
business not incidental to its municipal capacity as an agency
of the government; that the cost would fall upon the in-
habitants of Newport; that no city could so contract as to
lead to the imposition of a tax to pay for a water system in
another city, and if the enterprise was unsuccessful, the loss
would have to be made up by a tax upon property in New-
port, which would be a thing clearly beyond the power of the
the council to do. *Dyer v. Newport*, 29 Ky. Law 656, 94 S.
W. 25. Counsel contend that the case may be distinguished,
inasmuch as our statute gives power to acquire and "operate"
a water plant outside of the limits of a city. The word oper-
ate must be kept in its setting. The statute where the word
occurs, Rem. & Bal. Code, § 8005 (P. C. 77 § 1073), is so
obviously intended to give power to a city to acquire land
and a water supply and maintain head works or a pumping
station that we shall not take time to discuss it.

(3) The city entered into a contract with one John E.
Price & Company for the sale of the bond issue. The state
of the record is fairly stated by the complaint:

"That said defendant has made and entered into a con-
tract for the sale of the said bond issue with John E. Price
& Company, whereby the said company agreed to attend to all
proceedings necessary in the issuance of said bonds and to
take the bonds at a discount of five per cent, which would
amount to the sum of $11,250 on the whole issue, said dis-
count to cover all commissions, attorneys fees, and the pur-
chasing sale of said bonds; that said bonds draw six per cent
interest";

and the testimony of counsel for the city who had the pro-
ceeding in charge:

"Q. Who was to get that eleven thousand five hundred dol-
lars? A. Price & Company. Q. For what purpose were
they to be paid $11.500.00? A. It was a discount on the

17—90 WASH.

bonds, that is, it was given to make them a profit on the bonds above the rate the bonds themselves would bear . . ." [S. F. p. 65, line 29.] Q. What was that $11,280.00 for? [S. F. p. 66.] A. It was found by the way that gave a discount on the bonds. By Mr. Durham: Q. What was that, discount? A. That ordinance—or the first ordinance—and I drew it and was a little green in judgment and I drew it with the provision that the bonds ought to sell for par. When Price bid he thought he could get around the law and get the benefit of that discount, so they made that bid that way . . . . Q. What was the negotiations with Price & Co. in regard to the amount of interest the bonds were to draw? A. There is the contract, read it. Q. What was your understanding? A. Interest, I understood they bore six per cent, but they did not put it in writing so what does it amount to . . ."

This is clearly an evasion of the law. We had occasion to say, in *Uhler v. Olympia, supra,* that the taxpayer could not be put to the burden of paying a purchaser of the bonds anything in the way of commission or bonus or for attorney's fees and expenses of printing etc. The duty of the city and the privileges of the buyer are there set out, and we shall not restate them. It may be understood that the law will no longer tolerate the exploitation of the public in the way of taking payment for something for which the taxpayer gets no valuable consideration. The bond, when issued in conformity with existing laws, is a commodity or commercial paper, to be bought at its price or to be let alone. It is not seriously contended that the intended payment is not a discount for the benefit of the buyer—that is, a bonus pure and simple; but it is insisted that, inasmuch as the bonds are to be issued under an ordinance prepared by Price and Company which provides, in terms, that the rate of interest is "not to exceed six per cent," the proceeding is really in harmony with the holding in *Uhler v. Olympia* that bonds shall not bear a rate in excess of six per cent; that the city and the buyer had in mind that decision, and if the bonds are issued

under the ordinance at say, five and three-fourths per cent, the cost, $11,200, including a year's interest, will not exceed six per cent of the total amount of the issue. This is clearly a subterfuge. The law deals only with the interest upon the bonds, not the cost of issuing the bonds. The city has its own counsel and its governing board. The law presumes that they are able to issue a legal obligation without the assistance of others. The statute does not assume to fix a maximum rate of interest and permit the issuance of the bonds at a lesser rate, leaving the difference as a zone for exploitation out of which a city council can give the buyer or broker his commissions, attorney's fees and other expenses.

It is suggested, in a way, that the bond buyers will not take a bond issue unless, by one pretense or another, the bonds can be made to bear a rate higher than that proposed; the buyer in this case saying that such bonds have not found a market unless they draw seven per cent. But we cannot admit that the bond buyer or broker is the only available customer. The state buys municipal bonds without putting an unlawful burden on the taxpayer, and it is not unusual to sell such bonds to the citizens themselves upon a popular subscription. The proposal of the city offends the law, and will not be sanctioned by this court.

(4) The point is made that the city of Bremerton cannot acquire the plant and sell the surplus water because its present use is only forty per cent of the present supply. Whether a city could construct a water system calling for the development and delivery of water to the extent of sixty per cent beyond its present needs, might be questioned. We do not decide the question one way or the other, but it would seem that, where the city purchases an existing plant, it would have the right to take it as it is; otherwise, the object of the statute would be defeated.

Subject to the holding that Bremerton cannot purchase and maintain the distributing system in Charleston, but can only sell of its surplus to be delivered in gross, and that the Price

contract is unlawful and cannot be made a charge upon the
system, we hold the bonds to be a valid issue.

To the extent noted, the city will be restrained.

Remanded with instructions to enter a decree accordingly.
Appellants will recover their costs.

MORRIS, C. J., MOUNT, and ELLIS, JJ., concur.